UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
_____x

**GOCE GLIGOROV**
Jurckova cesta 161 1000
Ljubljana Slovenia,

Case No. 21-cv-1773

Plaintiff,                                 **VERIFIED COMPLAINT**

-against-

**NATION OF BRUNEI/ Office of HM Sultan of Brunei**
Istana Nurul Iman
Jln Menteri Besar
Bandar Seri Begawan, BA2112, Brunei

**BRUNEI INVESTMENT AGENCY**
Ministry of Finance and Economy Building - 12th Floor
Commonwealth Drive
Jalan Kebangsaan
Bandar Seri Begawan, Brunei BB3910

**AUDLEY & ANTON PROPERTY MANAGEMENT LIMITED**
27/28 Eastcastle Street
London, United Kingdom, W1W 8DH

**SULTAN HASSANAL BOLKIAH**
Istana Nurul Iman ,
Jln Menteri Besar,
Bandar Seri Begawan, BA2112
Brunei Darussalam

**CROWN PRINCE OF BRUNEI AL-MUHTADEE BILLAH**
Istana Nurul Iman
Jln Menteri Besar
Bandar Seri Begawan BA2112
Brunei Darussalam

**DORCHESTER COLLECTION**
East Lansdowne House – Sixth Floor
Berkeley Square
London, U.K. W1J6ER

**THE DORCHESTER GROUP, LLC**
East Lansdowne House – Sixth Floor
Berkeley Square
London, U.K. W1J6ER

**SEVEN PROPERTIES AG**
m Hausacher 10
8706 Meilen, Switzerland

**PG Yusof  Sepiuddin**
c/o Seven Properties AG
m Hausacher 10
8706 Meilen, Switzerland

**PEHIN NAWAWI**
Istana Nurul Iman
Jln Menteri Besar
Bandar Seri Begawan BA 2112 Brunei Darussalam

**PEHIN YASMIN**
c/o Ministry of Energy
Prime Minister's Office
Jalan Menteri Besar BB3913
Brunei Darussalam

**HJ ZAINAL**
ISD
Jalan Utama Menteri
Kampong Sungai Tilong,
Mukim Berakas B, BC3315
Brunei Darussalam

**HJ AZIYAN**
c/o Brunei High Commission
19-20 Belgrave Square
London SW1X 8PG U.K.

**ANAK HAJI ABDUL AZIZ**
c/o Ministry of Finance and Economy
Jalan Menteri Besar, Berakas BB3910
 Negara Brunei Darussalam

Defendants.

_____x

Plaintiff GOCE GLIGOROV, by and through his undersigned counsel, for his Verified Complaint against the above-captioned defendants, alleges as follows:

## PARTIES

1.      Plaintiff **GOCE GLIGOROV**, a Slovenian national and businessman who was a consultant for defendants during the relevant time period, suffered extensive monetary damages as a result of defendants conduct, as described herein.

2.      Defendant **THE NATION OF BRUNEI** ("Brunei"), a country located on the north coast of the island of Borneo, is one of the few absolute monarchies left in the world.  Crude oil and natural gas production account for about 90% of its GDP. About 167,000 barrels of oil are produced every day, making Brunei the fourth-largest producer of oil in Southeast Asia. It also produces approximately 25.3 million cubic meters of liquified natural gas per day, making Brunei the ninth-largest gas exporter in the world. *Forbes* also ranks Brunei as the fifth-richest nation out of 182, based on its petroleum and natural gas fields.

3.      In October 2013, Brunei announced its intention to impose Penal Code from the Sharia law on the country, where Muslims make up roughly two thirds of the country's population. This made Brunei the first and only country in East Asia to introduce Sharia law into its penal code, which imposes harsh Islamic law punishments for offences such as adultery and homosexuality. The move attracted international criticism, with the United Nations expressing "deep concern."

4.      With the imposition of strict Islamic law in the country, Brunei began a campaign to finance several Islamic terrorist organizations, including Hezbollah, Hamas and Boko Haram. Much of the financing of these organizations comes from money

transferred through a labyrinth of shell corporations many of them disguised as investments made by defendant **BRUNEI INVESTMENT AGENCY ("BIA")**, an arm of the Brunei Ministry of Finance.

5. Defendant **AUDLEY & ANTON PROPERTY MANAGEMENT LIMITED,** based in London, was wholly-owned and financed by defendant BIA.

6.     Defendant **SULTAN HASSANAL BOLKIAH** ("the Sultan") has complete executive power. He is concurrently Prime Minister, Foreign Minister, Defense Minister, Finance Minister and the head of Islam in Brunei. His word is law; no dissent or free speech is permitted in the country. After leading a lavish and profligate lifestyle for decades, the Sultan, in his capacity as Prime Minister, spearheaded legislation that would introduced the death penalty for homosexuality and adultery, by stoning. This sparked international protests and in calls for boycotts of numerous companies owned by the Brunei Royal Family, notably defendant The Dorchester Collection, a group of luxury hotels owned by the Sultan in the US and Europe.

7.     Defendant **CROWN PRINCE OF BRUNEI AL-MUHTADEE BILLAH** ("the Crown Prince") is the eldest son of Sultan Hassanal Bolkiah and his wife Queen Saleha. He is first in the line of succession to the Bruneian throne.

8.     Defendant **DORCHESTER COLLECTION**, headquartered in London, U.K, is owned by the Brunei Investment Agency ("BIA"), an arm of the Ministry of Finance of Brunei. The Dorchester Group and its affiliated company, defendant **THE DORCHESTER GROUP, LLC**, owns luxury hotels around the globe, including the Beverly Hills Hotel and Hotel Bel-Air in California. Defendants used the Dorchester

Group's bank accounts to launder substantial amounts of cash, which were then used to finance terrorist organizations.

9.      Defendant **SEVEN PROPERTIES AG**, located in Meilen, Switzerland, in the Canton of Zurich, is used by the other defendants to launder money used for the financing of terrorist organizations and other illegal activities.

10.     Defendant **PG YUSOF SEPLUDDIN** ran defendant Seven Properties AG during the relevant time period. Seven Property's bank accounts were used by the other defendants to hide and lauder substantial sums of money used for the financing of terrorist organizations and other illegal activities.

11.     Defendant **PEHIN NAWAWI** was, at all relevant times, the Personal Confidential Secretary ("PCS") to the Sultan. Nawawi had unlimited access to the "pocket money" of the Sultan, which was always kept at a minimum of $50 million USD.

12.      Defendant **PEHIN YASMIN**, the Minister for Energy in the Brunei Government during the relevant time period, who was also the Brunei head of intelligence. He was directly involved in the embezzlement and theft of government funds in Paris that Plaintiff had investigated, and was also instrumental in getting a "Blue Notice" issued by INTERPOL against Plaintiff, requiring him to be detained and questioned whenever he crossed an international border.

13.     Defendant **HJ ZAINAL** was, during the relevant time period, another major Brunei government figure who participated in the complex movement of money in order to finance terrorist organizations, money laundering and other illegal activities. He also led the campaign to destroy Plaintiff's reputation and business after Plaintiff

discovered substantial evidence linking the defendants to money laundering, terrorist financing and other illegal activities.

14.     Defendant **HJ AZIYAN** was, during the relevant time period, the Brunei High Commissioner in London. He was involved in the financing of terrorist organizations by Brunei through, among other things, the mysterious "theft" and sale of Channel watches with floating diamonds designed by a famous designer (Bellin) that went missing in Paris.

15.     Defendant **PERNGIRAN (PG) ANAK HAJI ABDUL AZIZ** was, at all relevant times, the head of Royal Protocol in Brunei. He was also Grand Chamberlain and Controller of the Royal Customs and Excise Department. Among other things, PG Aziz commissioned French designer Phillip Bellin to make several statutes for the Royal Palace, which had over 1800 rooms. Only approximately one-half of the statutes commissioned ended up being delivered to the Palace, with the remainder being sold on the black market to generate funds that were then used for the financing of terrorist organizations.

## **JURISDICTION AND VENUE**

16.     This Court has personal jurisdiction over all defendants by virtue of the fact that their acts of racketeering and/or other tortious activities had a direct impact on business and other activities in the United States, or by operation of Fed. R. Civ. P. 4(k) (1-2). There is a substantial connection between the U.S. and the defendants in that they do substantial business in United States through various hotels and various companies, including the Dorchester Collection, which owns and operates the Beverly Hills Hotel in

Beverly Hills, California, and the Bel Air Hotel in Los Angeles California. In  hotels,
Audley Property Management Company Limited, Seven Properties AG, Premier
International Management Limited and the Dream Hotels (including the Dream Midtown
and Dream Downtown in New York City).

17.     This Court has federal question subject matter jurisdiction pursuant to 18
U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1964 (c) (RICO). Plaintiff
alleges that defendants conducted multiple racketeering activities that had a continuity of
structure and purpose over an extended period of time. RICO provides federal
jurisdiction for persons "injured in [their] business or property" by acts taken pursuant to
a racketeering "enterprise." 18 U.S.C. § 1964 (c).

18.     This Court has subject matter jurisdiction over this matter under 28 U.S.C.
§ 1330(a), and personal jurisdiction over Defendant Brunei under 28 U.S.C. § 1330(b), in
that Defendant is a foreign state and the takings exception to jurisdictional immunity
pursuant to 28 U.S.C. § 1605(a)(3) applies.  Under these jurisdictional provisions of the
Foreign Sovereign Immunities Act, 28 U.S.C. § 1601, *et seq*., ("FSIA"), jurisdiction
exists over this subject matter and over defendant, because plaintiff's rights in property
taken by defendants in violation of international law are at issue, and property exchanged
for the taken property is present in the United States in connection with the numerous
commercial activities carried on in the United States by defendants.

19.     This Court has subject matter "diversity jurisdiction" over a case under
Title 28, United States Code, Section 1332, in that the amount in controversy exceeds
$75,000 and there is complete diversity of citizenship between the parties.

20.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the laws of the State of New York.

21.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. § 1391 (b) and (c). Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## RELEVANT FACTS

22.     Starting in 2011, Plaintiff met with high-ranking officials in Brunei and was invited to attend numerous Brunei State events. As a result of these relationships, various representatives of the Sultan and Crown Prince of Brunei asked Gligorov to investigate certain matters of critical importance to Brunei and to provide them with information relating to allegations of alleged wrongful and illegal acts by other Brunei officials. Gligorov agreed to gather and provide such critical information, based on a contract and agreement that he would be paid $250,000 for doing so.

23.     Pursuant to this agreement, starting in 2016, Plaintiff provided defendants and their representatives valuable information in 2016 relating to wrongful and illegal acts by certain Brunei officials,  including (1) the theft and embezzlement of money and valuables of Brunei in Europe, (2) the financing of terrorist groups, including Hamas, Hezbollah and Boko Haram, through banks and financial institutions that were financing these terrorist organizations and illegally laundering money for them through investment accounts managed by the Brunei Investment Agency and other Brunei ministries and agencies, and (3) information about business competitors and persons/entities who/which opposed the Sultan and his efforts to increase commercial investments in the United States, specifically in New York and Los Angeles.

24.     In addition to providing defendants with valuable information regarding violations of the laws of Brunei, Plaintiff also provided Brunei authorities with information regarding violations of numerous U.S. laws, including the National Defense Authorization Act (NDAA), including whistleblower provision, e.g., Section 6314 and 31 U.S.C. § 5323(a); the Department of Defense Authorization bill, includes Anti-Money Laundering Act of 2020 (AMLA); the Bank Secrecy Act ("BSA"), 21 U.S.C. 5311 et seq.; various Anti Money Laundering and Anti-Terrorism Funding Laws, including the Money Laundering Control Act (1986); Annunzio-Wylie Anti-Money Laundering Act (1992); Money Laundering Suppression Act (1994); Money Laundering and Financial Crimes Strategy Act; the Anti-Terrorism Act of 2001 (USA PATRIOT Act) and the Intelligence Reform & Terrorism Prevention Act of 2004.

**Use of Money Laundering to Disguise Financing of Terrorist Organizations**

25.     Much of defendants' support for terrorist organizations was provided through bags of cash disguised as diplomatic "post" bags, which were transported through the use of charter jets from London and Geneva. Financial support for Boko Haram was provided through cash transported from Brunei with Brunei government or defendants privately owned jet (often with hidden ownership). This illegal use of diplomatic immunity and "cover" by Brunei, as well as the direct cash financing through jet flights originating in Brunei, was coordinated by the individual defendants affiliated with the Brunei government.

26.     In addition to the illegal use of diplomatic pouches to finance terrorist organizations, Plaintiff's investigation showed that defendants used numerous bank accounts to disguise Brunei's financing of terrorist organizations. For example,

defendants used the various bank accounts of defendant Seven Properties AG, based in Zurich, Switzerland, to move substantial amounts of money so that it could not be traced back to Brunei. These bank accounts were located in numerous banks, including Habib Bank AG Zurich, Bordier & Cie Bank, Landolt & Cie Bank, Arab Bank (Switzerland), Julius Baer Group, and Banque Audi S.A.I Lebanon (Suisse).

27.     Defendants also used bank accounts of defendant Audley & Anton Property Management Limited, based in London (wholly owned by defendant BIA) to finance terrorist organizations. Among other things, it funneled substantial funds to Hamas through various Palestinian front organizations, including the Palestinian Museum & Cultural Centre, 27 Broad Street, Bristol, U.K.

28.     Plaintiff also investigated the "loss" of $100 million USD that the Brunei Government had in Paris, a substantial portion of which Plaintiff was able to trace to various terrorist organizations that were being financed by defendants.

29.     Plaintiff met with representatives of Brunei at various meetings in London, Singapore and the United States, at which they discussed the information that Plaintiff had gathered, which Plaintiff was told was proving to be extremely helpful to the Sultan, but detrimental to various corrupt officials in the Brunei Government. The representatives of Brunei also communicated with Plaintiff through the use of official Brunei government email addresses (in Brunei) and private email addresses through 'live.com' (in the United States) and 'gmail.com' (in the United States).

30.     During this time period, defendants' representatives confirmed that Plaintiff would be paid the $250,000 agreed to for the above information. After reviewing

the information he provided, they also confirmed the accuracy of the information, and they also confirmed that the information was not available from an otherwise public sources.  However, in 2016, even after determining that the information provided by Plaintiff was genuine and not already publicly available, these Brunei representatives failed to pay him the $250,000 that was owed.

31.     The information provided by Plaintiff shook the Brunei Government like an earthquake, since it exposed corruption at the highest levels. One Brunei government officials told Plaintiff, for example: "I am horrified about your information, where you are informing me that Brunei officials are involved in international terrorism." This official requested that Plaintiff and his team to continue to treat the information as "highly confidential."

32.     Instead of using the information provided by Plaintiff to root out the corruption at the highest levels of the government, a decision was apparently made that it would be easier to discredit the source of the information, i.e., the Plaintiff, and to bury the information and evidence he had gathered.

33.     Thereafter, the representatives of defendants terminated all communications with Plaintiff, and without prior notice to him, made false and defamatory allegations about him to INTERPOL, caused a "Blue Notice" to be issued by that international agency, demanding that Plaintiff be stopped at international borders to "collect additional information about him in relation to a crime."[1]

---

[1] *See https://www.interpol.int/en/How-we-work/Notices/About-Notices - Blue Notice: To collect additional information about a person's identity, location or activities in relation to a crime.*

34.     The primary representative of Brunei who give the order to have Interpol issue the "Blue Notice" against Plaintiff was defendant Pehin Yasmin, the Minister for Energy in the Brunei Government, who was also the head of intelligence. He was directly involved in the embezzlement and theft of government funds in Paris that Plaintiff had investigated.

35.     Another major government figure who led the campaign to destroy Gligorov's reputation and business was defendant Hj Zainal, a member of the Internal Security Department (ISD) in Brunei. He was actively involved with money laundering and terrorist financing, particularly on behalf of Boko Haram representatives in Brunei.

36.     On July 10, 2018, Plaintiff was detained by U.S. Customs at JFK Airport in Queens, New York based on the "Blue Notice," which, upon information and belief, is still in the Interpol system and causes Plaintiff problems whenever he tries to cross international borders. This has not only interfered with his ability to conduct his business, but has also seriously damaged his business and reputation.

### CLAIMS FOR RELIEF

### COUNT I

**(Racketeering Activity in Violation of the Racketeering Influenced and Corrupt Practices Act. 18 U.S.C. § 1961 et seq.)**

37.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

38.     At all times relevant to this Complaint, defendants and their agents ad co-conspirators have, as part of the Racketeering Enterprise, conducted, directly and indirectly participated in, and conspired in a pattern of racketeering activity, including mail and wire fraud that took place in New York and elsewhere in the United States, in violation of 18 U.S. C. §§ 1962(c) and (d). Each defendant subscribed to and endorsed the unlawful purposes of the Racketeering Enterprise, and either participated in, facilitate and/or aided and abetted at least two of the predicate acts that had sufficient relatedness and continuity to form a pattern of racketeering activity that continued to the present.

39.     Defendants' pattern of racketeering activity included the unlawful actions and activities of defendants and their co-conspirators identified in this Verified Complaint, including but not limited to, the mailings, faxes and email communications between various international locations, such as New York and elsewhere in the U.S., as well as in London, Paris, Brunei and elsewhere in the world, constituting wire fraud in violation of 18 U.S.C. § 1343, the use of the mails for purposes of mail fraud in violation of 18 U.S.C. § 1341, and unlawful money transfers in violation of 18 U.S.C. § 1956.

40.     Since approximately 2016 and continuing to the present, defendants and their agents and co-conspirators have, upon information and belief, invested their racketeering proceeds in various financial investments in the United States, in violation of 18 U.S.C. § 1962(a). These investments have enabled the Racketeering Enterprise to operate under the cover of legitimacy when engaging in their various acts of racketeering.

41.     Since approximately 2016 and continuing to the present, defendants and their agents and co-conspirators have also acquired and maintained control of and interests in various companies and enterprises operating in interstate and foreign

commerce in New York and elsewhere in the United States, as well as abroad, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b). Defendants' Racketeering Enterprise involved a complicated web of shell companies, business deals and investment vehicles in the United States, which engaged in interstate commerce and over which the named defendants and their co-conspirators had total domination and control. These acquisitions and maintenance of interests have enabled defendants to operate under the cover of legitimacy when engaging in their racketeering activities and distributing the unlawful profits of the Racketeering Enterprise.

42.     As a direct and proximate result of defendants' violation of 18 U.S.C. §§ 1962(a)-(d), the Plaintiff has been injured in his business and property within the meaning of the civil RICO statute, by, among other things, (a) being deprived of compensation that was owed to him by defendants, (b) having his business and reputation damages as a result of the false accusations and misrepresentation made about him by defendants, and (c) being forced to pay for legal representation in order to defend himself and his business against false claims and misrepresentations by defendants.

43.     The damages suffered by Plaintiff was reasonably foreseeable, and, in fact, anticipated and intended by defendants as the natural consequence of their acts.

## COUNT II

## (BREACH OF CONTRACT)

44.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

45.     Plaintiff and defendants had a agreement whereby Plaintiff agreed to investigate allegations of corruption by certain Brunei officials in return for the payment of $250,000.

46.     Plaintiff performed the services required under the agreement, and provided defendants with valuable information regarding certain illegal and corrupt actions and activities by certain present and former Brunei government officials.

47.     Defendants breached the contract and agreement they had with Plaintiff by failing to pay him for the services and valuable information he provided to them.

48.     As a result, Plaintiff suffered damages in the amount of $250,000, plus interest.

## COUNT III

### (UNJUST ENRICHMENT)

49.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

50.     The doctrine of unjust enrichment allows a plaintiff to recover from a defendant without the benefit of an enforceable contract where the defendant has unfairly benefited from the plaintiff's efforts without compensation. Under District of Columbia law, a claim for unjust enrichment has three elements: (a) the plaintiff conferred a benefit on the defendant; (b) the defendant retains the benefit; and (c) under the circumstances, the defendant's retention of the benefit is unjust. *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008). A cause of action for unjust enrichment has its roots in the common law concept of quasi-contract. Bregman v. Perles,

747 F.3d 873 (D.C. Cir. 2014); see also, *4934, Inc. v. D.C. Dep't of Emp't Servs*., 605 A.2d 50, 55 (D.C. 1992). A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.

51.     Defendants herein were unjustly enriched as a result of their failure to pay for the services and valuable information Plaintiff provided to them.

52.     As a result, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT IV

## (FRAUD AND FRAUDULENT INDUCEMENT)

53.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

54.     The essential elements of common law fraud under District of Columbia law are: "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226, 1233 (D.C. 2005) (quoting *Atraqchi v. GUMC Unified Billing Servs.,* 788 A.2d 559, 563 (D.C. 2002).

55.     Defendants here knowingly and intentionally defrauded Plaintiff by inducing him to perform valuable services and to provide them with valuable information upon the false representation that he would be paid $250,000 for his services, without the intent of doing so.

56.     As a result thereof, Plaintiff was damaged in an amount to be determined at trial.

## COUNT V

## (DEFAMATION PER SE)

57.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

58.     According to District of Columbia law, defamation claims have four elements: (a) the defendant made a false and defamatory statement concerning the plaintiff; (b) the defendant published the statement without privilege to a third party; (c) the defendant's fault in publishing the statement amounted to at least negligence; and (d) either the statement was actionable as a matter of law irrespective of special harm or its publication caused the plaintiff special harm. See *Jankovic v. International Crisis Group*, 429 F.Supp.2d 165, 173-4 (D.D.C. 2006).

59.     The bad-faith issuance by defendants of the "Blue Notice" relating to Plaintiff constitutes defamation per se under New York, which does not require proof of the exact amount of the damages suffered.

60.     In this case, the defamation per se has been on a continuous basis and constitutes an ongoing tort since the "Blue Notice" was first issued by Interpol based upon a false report by the defendants and their agents since, upon information and belief, it is still on the Interpol System and continues to cause him business damages. This defamation is, therefore, subject to the Ongoing Tort Doctrine, which holds that where

there is a series of continuing wrongs, the continuing wrong doctrine tolls the limitation period until the date of the commission of the last wrongful act.

61.     As a result, Plaintiff suffered damages in an amount to be determined at trial, but at least $400 million.

## COUNT VI

### (TORTIOUS INTERFERENCE WITH PLAINTIFF'S BUSINESS RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE)

62.     Plaintiff repeats and realleges the foregoing paragraphs of this Verified Complaint as though fully set forth herein.

63.     The prima facie case of tortious interference with business relations or with reasonable expectation of prospective economic advantage entitles a plaintiff to recover for monetary damages when he can show that a defendant intentionally interfered with his business. *Jankovic v. International Crisis Group*, 593 F.3d 22, 29 (D.C. Cir. 2010); *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,* 957 A.2d 890, 900 (D.C. 2008).

64.     Defendants intentionally spread false and defamatory statements about a plaintiff and his business, including false statements to INTERPOL and others leading to the issuance of the Blue Notice against plaintiff. This was both damaging to plaintiff's business at the time such false statements were made, but also tortious interfered with his prospective economic opportunities.

65.     As a result, Plaintiff suffered damages in an amount to be determined at trial.

## JURY TRIAL DEMAND

66.     Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, by and through his attorneys, demands judgment against

each of the Defendants, as follows:

   a.  Judgment in favor of Plaintiff;

   b.  An award of treble damages on Count I (Civil RICO);

   c.  An award of compensatory damages on Counts I through VI, in an amount of not less than $400 million;

   d.  An award of punitive damages;

   e.  An award of attorneys' fees and costs; and

   f.  Such other and further relief as the Court deems just and proper.

Dated: New York, New York
          July 2, 2021

                                    McCALLION & ASSOCIATES LLP

                                    /s/ Kenneth F. McCallion

                                    _____
                                    Kenneth F. McCallion ( Bar # KFM-1591)
                                    100 Park Avenue – 16th floor
                                    New York, New York 10017
                                    (646) 366-0884
                                    Attorneys for Plaintiff

**VERIFICATION**

GOCE GLIGOROV, being duly sworn, deposes and says:

1.  I am the Plaintiff in the above-captioned matter and am fully familiar with the
    facts and circumstances of this case.

2.  I have read and reviewed the foregoing Complaint and find the contents to be true
    and correct to my own personal knowledge, except as to those matters affirmed on
    information and belief, and as to those matters, I believe them to be true and
    correct.

                                                    _____
                                                    GOCE GLIGOROV

NOTARY PUBLIC

Sworn to before me this

~~day of June, 2021~~

I, Stuart R. Denyer, Consul, assume no responsibility
for the truth or falsity of the representations which
appear in the foregoing document.

On the 2 day of July in the year 2021
Before me Stuart R. Denyer, Consul
of the United states of America at Ljubljana, Slovenia
duly Commissioned and qualified personally came
Goce Gligorov
To me known, and known to me to be the individual(s)
Subscribed in and who executed the foregoing instrument(s)
And (severally) acknowledged that he (they) executed
the same

REPUBLIC OF SLOVENIA
CITY OF LJUBLJANA
EMBASSY OF THE
UNITED STATES OF AMERICA  ⎦ SS

_____        19
Stuart R. Denyer
Consul
U.S. Embassy Ljubljana



commision indefinite.